JORDAN MATTHEWS (SBN 316301)
WEINBERG GONSER LLP
10866 Wilshire Blvd., Suite 1650
Los Angeles, CA 90024
Telephone:   (424) 239-2867
Facsimile:   (424) 238-3060
Email:       jordan@weinberg-gonser.com

MICHAEL D. HOLTZ (SBN149616)
THE HOLTZ FIRM
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:   (310) 464-1088
Facsimile:   (323) 206-5535
Email:       mholtz@theholtzfirm.com

Attorneys for Plaintiff *Angelica Limcaco*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELICA LIMCACO, an individual<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>STEVE WYNN, an individual;<br>MATTHEW MADDOX, an individual;<br>KIMMARIE SINATRA, an individual;<br>WYNN RESORTS, LTD., a Nevada<br>Corporation; DOES 1 through 10,<br>inclusive and ROE CORPORATIONS 1<br>through 10, inclusive,<br><br>　　　　　　　　Defendants. | CASE NO.<br><br>**COMPLAINT FOR:**<br><br>**(1) CIVIL RICO LIABILITY UNDER 18 U.S.C. § 1962(c)**<br><br>**(2) CIVIL RICO LIABILITY UNDER 18 U.S.C. § 1962(c)**<br><br>**(3) CONSPIRACY TO COMMIT CIVIL RICO LIABILITY UNDER 18 U.S.C. § 1962(d)**<br><br>**DEMAND FOR JURY TRIAL** |

///

///

1

Plaintiff, ANGELICA LIMCACO, alleges as follows:

## I.      SUMMARY OF THE CASE

1.     This action is brought pursuant to the Racketeer Influenced Corrupt Organization Act ("RICO") (18 U.S.C. 1961 et seq.) arising from the RICO Defendants' (defined below) illegal and corrupt efforts to make illicit payments to a federal official (here, Barbara Buckley ("Buckley"), the former Speaker of the Nevada State Assembly and the Executive Director of the Legal Aid Center of Southern Nevada (the "LACSN")), in an effort to directly or indirectly influence a judicial decision in the United States District Court, District of Nevada (the "Nevada District Court") that was rendered in **April 2019**.  This illicit conduct directly coincided with the RICO Defendants' efforts to illegally and corruptly save its $2.6 billion investment into its casino in Everett Massachusetts, which was then scheduled to open in **June 2019** (the "Wynn Boston Casino").  Through kickbacks and political cronyism crossing the line of legality and other unlawful methods, the RICO Defendants conspired to influence a decision on the Nevada Matter (defined below), which arose out of Plaintiff Angelica Limcaco's ("Limcaco") prior report concerning a rape allegation against disgraced casino mogul, Steve Wynn (the "Limcaco Sexual Assault Report").

2.     The Nevada Matter arose out of an incident in **July 2005**, when Limcaco, the former manager of the salon at the newly opened Wynn Las Vegas casino and resort ("WLV") was asked by her assistant, Carolyn, to meet with an employee (a manicurist named Andrea) about a sensitive issue.  When Limcaco met with Andrea, she informed Limcaco that Steve Wynn had raped her and that she was pregnant with his child.  Limcaco reported the incident and was threatened to remain silent by her superior, Doreen Whennen ("Whennen"), an agent of Steve Wynn.  Steve Wynn organized Andrea's abrupt removal without explanation and

induced Limcaco to believe that Andrea had been kidnapped or murdered (and that the same would happen to her if she came forward). As multiple other employees of the salon came forward to Limcaco and reported sexual assault allegations against Steve Wynn, Limcaco was told that Steve Wynn was more powerful than the police and that he had bodies buried in the desert. After meeting with Andrew Pascal (the then-COO of WLV) regarding her concerns about the sexual assault allegations against Steve Wynn, Limcaco was abruptly terminated, blacklisted and forced to declare bankruptcy. The RICO Defendants later organized spying operations to intimidate those who were coming forward and the RICO Defendants openly and notoriously maintained relationships with individuals tied to organized crime and corruption. **The RICO Defendants initially withheld information from the Nevada Gaming Control Board (the "NGCB") about the Limcaco Sexual Assault Report to maintain their casino licenses in Nevada**.

3.    In or around **2012**, the RICO Defendants sought a casino license in Massachusetts. Pursuant to the Massachusetts Gaming Act (the "Act"), any qualifier for a casino license was and is prohibited from conducting business with individuals with criminal backgrounds, as further discussed herein. **The RICO Defendants withheld information about their business with those affiliated with La Cosa Nostra and their knowledge about the circumstances surrounding the Limcaco Sexual Assault Report in order to illicitly obtain a casino license in Massachusetts (in direct violation of the Act)**.

4.    The RICO Defendants entered into a partnership with FBT Everett Realty, LLC ("FBT") (as FBT owned land in Massachusetts that is now the cite of the resort and casino, Encore Boston Harbor, owned by Wynn Resorts), which was owned, in part, by Charles Lightbody ("Lightbody"). Lightbody was known for his ties to organized crime and specifically, as being an associate of the New England Family of La Cosa Nostra and a convicted felon. The RICO Defendants

withheld their knowledge of Lightbody's involvement in FBT's partnership with Wynn Resorts in an improper effort to obtain a casino license in Massachusetts (and in clear violation of the Act).

5.      Wynn Resorts was ultimately awarded the license in or around **September 2014**.  Within weeks of a casino license being awarded to the RICO Defendants in Massachusetts, on **October 2, 2014**, the Department of Justice (the "DOJ") indicted Lightbody and two other members of FBT (Dustin DeNunzio ("DeNunzio") and Anthony Gattineri ("Gattineri")) for their role in concealing Lightbody's financial interests in FBT from Massachusetts gaming regulators (in connection with FBT's partnership with Wynn Resorts).  Lightbody, DeNunzio and Gattineri were charged with conspiracy to commit wire fraud, wire fraud and aiding and abetting.

6.      The RICO Defendants also improperly withheld their knowledge of the Limcaco Sexual Assault Report when it became a central issue in Wynn Resorts' ongoing litigation with its co-founder and former Vice Chairman, Kazou Okada ("Okada").[1]   The RICO Defendants have a history of affiliating with individuals tied to corruption.  The genesis of the Okada Litigation, which was filed by Wynn Resorts against Okada, was a forty-seven (47)-page report prepared by Louis J. Freeh, the Fifth Director of the Federal Bureau of Investigation (the "FBI"), which evidenced approximately thirty-eight (38) payments to gaming officials in the Philippines **in connection with Okada's efforts to obtain a casino license** (in apparent violation of the Foreign Corrupt Practices Act (the "FCPA")).  The United States government intervened into this litigation and conducted a criminal investigation.  Okada filed a cross-complaint and similarly alleged that

---

[1] *Wynn Resorts, Ltd., v. Kazuo Okada, et al.* (Case No. A-12-656710-B, District Court, Clark County, Nevada) (the "Okada Litigation").

Wynn Resorts **issued improper payments to the University of Macau Development Foundation (where one of its trustees was a government official)**[2] **in the amount of about $135 million in a land rights deal for a casino in Macau**. The SEC launched a probe, but eventually declined further investigation.

7.      When Elaine Wynn (Steve Wynn's now ex-wife) failed to gain re-election to the Wynn Resorts' board of directors in **2015**, she filed a Fifth Amended Cross-Complaint in the Okada Litigation in **2016**. Elaine Wynn made the Limcaco Sexual Assault Report a central issue (as she alleged that Steve Wynn had engaged in "reckless risk-taking behavior" in connection with a settlement involving sexual assault in 2005). **After the Fifth Amended Complaint was filed, the RICO Defendants withheld their knowledge of the circumstances surrounding the Limcaco Sexual Assault Report from the Massachusetts Gaming Commission (the "MGC")**.

8.      Sinatra was present for both Steve Wynn and Whennen's depositions in the Okada Litigation in **2017**, where the Limcaco Sexual Assault Report was a central issue. Sinatra was also present for Maddox's deposition in the Okada Litigation in **2017**, where the same issues arose. **The RICO Defendants continued to withhold this information from the MGC in an effort to not disturb Wynn Resorts' newly obtained casino license in Massachusetts**.

9.      The details of the Limcaco Sexual Assault Report were publicly revealed by a Wall Street Journal ("WSJ") report initially published on or around **January 26, 2018, and entitled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn" (the "WSJ Expose")**. **The**

---

[2] The Chancellor of the University of Macau Development Foundation was head of the Macau government. **This "donation" was effectively an indirect bribe issued to a public official in connection with a land rights deal Wynn Resorts was pursuing in Macau, China**.

**NGCB and the MGC immediately launched sweeping investigations and the RICO Defendants' coveted casino license in Massachusetts on its $2.6 billion project (set to open in June 2019) <u>was at risk</u>**.

10.    The RICO Defendants promptly initiated a campaign to control the fallout.  Steve Wynn resigned as Chairman and CEO of Wynn Resorts.  As he was the first CEO of a publicly traded company to be publicly outed in the wake of the "Me Too" movement, he abruptly stepped down as Chairman of the Republican Finance Committee (noting that he took the post at the beginning of Donald Trump's Presidency a year earlier in or around **January 2017**).  The company was forced to settle the Okada Litigation (a six-year ongoing board room war with no end previously in sight), so that Steve Wynn was no longer blocked from selling all of his shares in the company.  Maddox was installed as Wynn Resorts' new CEO.  The company's board of directors was revamped.  Sinatra was forced to resign in connection with evidence establishing her complicity in the cover-up of Steve Wynn's sexual misconduct.  Everything was on the line, as there were public rumors that Wynn Resorts would be sold. **The RICO Defendants had everything to lose and desperately sought to save the company (and specifically, its $2.6 billion casino project in Massachusetts)**.

11.    Mistakenly believing that she was safe from the threat of being kidnapped, murdered or otherwise harmed for coming forward against Steve Wynn, Limcaco filed suit in the United States District Court, District of Nevada on **September 4, 2018** (substantially under a theory of wrongful termination in violation of Title VII of the Civil Rights Act of 1964).  She explicitly argued that the defendants (Steve Wynn and WLV) were equitably estopped from arguing the statute of limitations as a defense, since they abruptly removed Andrea after a rape allegation against Steve Wynn (the most powerful man in Las Vegas, a city largely built and infiltrated by the mafia) to convince Limcaco that Andrea had been

kidnapped or murdered.  After she reported Andrea's rape incident, Limcaco was explicitly threatened by Whennen to never speak about the rape incident.  She was told that Steve Wynn had bodies buried in the desert, that he was more powerful than the police and that he killed a publication about a girl who disappeared on his boat.  Limcaco was also abruptly wrongfully terminated for reporting sexual assault, blacklisted and forced to declare bankruptcy after being pummeled by such an outrageous abuse of power.  Limcaco had been silenced.

12.    When she finally came forward, Limcaco's concerns proved correct, as Wynn Resorts (WLV's parent company) not only directed James Stern (the former head of security for Wynn Resorts) to follow and intimidate those who were coming forward, but the RICO Defendants (in their unquenchable thirst for power) attempted to corrupt the judicial process with illicit payments intended to influence a decision in Limcaco's case.  As evidenced from the RICO Defendants' relationship with Okada, their prior questionable "donation" to the University of Macau Development Foundation related to a land rights deal and their corruption of the Massachusetts gaming license process, issuing payments used to influence a decision in the Nevada Matter was merely "business as usual."

13.    When Limcaco filed suit on **September 4, 2018**,[3] the RICO Defendants were under extensive investigation by the MGC.  Their licenses relating to the Wynn Boston Casino (due to open in **June 2019**) were at risk of being revoked and the RICO Defendants simultaneously embarked upon an extensive campaign to desperately save their licenses, as noted above.

14.    The named defendants in the Nevada Matter were WLV and Steve Wynn.  WLV was initially represented by Elayna Youchah ("Youchah") and

---

[3] *Angelica Limcaco v. Wynn Resorts, et al.* (Case No. 2:18-cv-01685-MMD-GWF) (the "Nevada Matter").

Daniel Aquino ("Aquino") of Jackson Lewis, P.C. in Las Vegas and Steve Wynn was represented by Tamara Peterson ("Peterson") and Nikki Baker ("Baker") of Peterson Baker PLLC.  Judge Miranda Du was assigned as the District Judge and Magistrate George Foley served as the Magistrate Judge.  WLV and Steve Wynn each filed motions to dismiss Limcaco's first amended complaint in the Nevada Matter.  Limcaco served her initial disclosures on the defendants on **November 21, 2018**, evidencing $807,083.22 in actual damages (based on her salary only), and addressed future damages, punitive and exemplary damages, and attorney's fees and costs.  Youchah filed WLV's motion to dismiss and virtually every brief on behalf of WLV in the case.  Briefing on the motions to dismiss initially closed on **December 26, 2018**.

15.    Beginning in **January 2019**, the NGCB released public documents regarding its investigations into sexual misconduct allegations against Steve Wynn.  The NGCB released a complaint, stipulation and order regarding a fine against the company in the amount of Twenty Million Dollars ($20,000,000), the largest fine ever issued by the agency against a company.  On or around **March 15, 2019**, the MGC completed a Two Hundred (200) page report in connection with its one-year investigation into the company (the "Wynn MGC Report").   These public documents evidenced the RICO Defendants' pattern of intimidation, extraordinary abuses of power and attempts to improperly cover up Andrea's rape allegations.  While all of this was occurring, a public hearing was set to occur in Massachusetts from **April 2, 2019 to April 4, 2019**, regarding whether the MGC would revoke the applicable gaming licenses in connection with the Wynn Boston Casino (set to open in **June 2019**).

16.    Limcaco promptly requested judicial notice of each of these documents (as soon as each document became publicly available), as the documents evidenced the defendants' (in the Nevada Matter) efforts to prevent

Limcaco from coming forward.  Youchah (on behalf of WLV) filed motions to strike (and related briefs) regarding these requests throughout **February and March of 2019**.  On **April 2, 2019** (the same date that the MGC's public hearings began in Massachusetts), Deverie Christensen ("Christensen"), Youchah's colleague at Jackson Lewis in Las Vegas, filed a notice of appearance.  On the same date, Christensen filed a reply brief in connection with WLV's second motion to strike, removing Youchah's name from the pleading (**noting that Youchah had filed every brief on behalf of WLV prior to that date**).  Youchah was still ostensibly listed as WLV's lead counsel and had not withdrawn from the case.

17.    Six days later, on **April 8, 2019**, counsel for Wynn MA, LLC ("Wynn MA") (the subsidiary of Wynn Resorts that operated the Wynn Boston Casino) submitted a post-hearing brief to the MGC.  **This brief confirmed that Wynn Resorts would actively report on litigation to the MGC**.  Although this brief explicitly provided that the company would notify the MGC within ten (10) days of notice of any lawsuit against a qualifier for a gaming license related to the Wynn Boston Casino, Maddox, in particular, was actively sharing information with the MGC in an effort to maintain "transparency" **and to preserve the applicable gaming licenses in Massachusetts**.  Everything was on the line during this crucial period.

18.    Ten days later, on **April 18, 2019**, the Nevada District Court dismissed the Nevada Matter, and sided with WLV and Youchah on all issues.  Twelve days later, on **April 30, 2019**, the MGC issued an order, fining Wynn Resorts a record $35,000,000 (and fining Maddox $500,000), **but allowing Wynn Resorts and the related gaming license qualifiers to keep their licenses in Massachusetts.  Their campaign was successful**.  Nonetheless, Miller & Chevalier, a Washington D.C. law firm specializing in government investigations

into bribery, public corruption, violations of the FCPA and related matters was **selected to monitor Wynn Resorts, Maddox et al. for a period of five years over concerns of repeated misconduct**.

19.    Unbeknownst to Limcaco at the time, it was publicly announced that Youchah would fill Magistrate Foley's (**the Magistrate in the Nevada Matter**) vacancy in the United States District Court, District of Nevada on **May 17, 2019** (the **public announcement** occurred about one month after the dismissal of Limcaco's case and merely weeks after the decision from the MGC on **April 30, 2019**).   Youchah was elevated to the very Court that ruled on her motion dismissing the Nevada Matter and the public announcement occurred just after the Nevada Matter was dismissed and the MGC issued a favorable ruling to her client, Wynn Resorts.

20.    The dismissal of the Nevada Matter (which was centered around the Limcaco Sexual Assault Report that was the catalyst for the investigations by the NGCB and the MGC), was **directly tied to the RICO Defendants' efforts to maintain their casino license in Massachusetts**.   On or around **February 29, 2020**, Limcaco (through counsel) discovered that Youchah (WLV's lead counsel) was actively engaging with the Nevada District Court regarding the vacancy of Magistrate Foley effectively during the entire pendency of Limcaco's case. Youchah was simultaneously filing briefs and a dispositive motion and there was no disclosure about this conflict of interest.   Youchah was then apparently selected to fill the vacancy (of a Judge in Limcaco's case) in **late March/early April of 2019** (**noting Christensen's notice of appearance on April 2, 2019 and the removal of Youchah's name from a reply brief filed on the same date**).   The Nevada District Court then rendered a decision on **April 18, 2019** and sided with Youchah on all issues.   However, in **April 2020**, new information came to light.

21.     The merit selection panel that was designated on **December 3, 2018** by the Nevada District Court, to fill the vacancy of Magistrate Foley, included Buckley.  This panel selected Youchah (WLV's lead counsel) to fill Magistrate Foley's vacancy.  Buckley and her foundation (the LACSN) have close ties to both the Nevada District Court and Wynn Resorts/WLV.  Buckley's salary is derived from her services on behalf of the LACSN.  Peterson and Donald Campbell (both longtime counsel to Steve Wynn and noting that Peterson was Steve Wynn's counsel in the Nevada Matter) were also appointed to separate merit selection panels with Buckley on both **October 2, 2018 and January 2, 2019**.  Steve Wynn's counsel had direct ties to Buckley during the pendency of the Nevada Matter.

22.     Sinatra, Wynn Resorts' former general counsel, who separated from the company on or around **August 3, 2018 (due to her involvement in covering up the Limcaco Sexual Assault Report and related events)**, is on the LACSN's board of directors.  Even though Sinatra "separated" from the company in **August 2018**, her separation agreement (filed with the SEC) established that she was contractually obligated to the company through **December 31, 2018** (this coincides with Buckley's appointment on **December 3, 2018** to the merit selection panel that ultimately selected Youchah).  More importantly, **<u>Wynn Resorts was in an ongoing conditional financial relationship with Buckley and the LACSN</u> when Buckley was appointed to the merit selection panel in December, 2018**.

23.     Pursuant to a memorandum of understanding between Wynn Resorts/WLV and the LACSN (and signed by Sinatra and Buckley), **Wynn Resorts/WLV was set to pay the LACSN $100,000 in April 2019 (around the time Youchah was selected, Limcaco's case was dismissed, and the MGC issued an order allowing Wynn Resorts to keep its casino license in Massachusetts)** (the "MOU," or "Exhibit A").  This payment was conditional and

could be revoked in Wynn Resorts'/WLV's sole discretion.  **After Limcaco's case was dismissed, Wynn Resorts (which wholly owns WLV), then sponsored the LACSN's 19th annual awards on December 13, 2019**.  Sinatra was also part of a group (here, the group included David Belding and the Matthewson Charitable Lead Trust) that "donated" $250,000 to the LACSN, which was announced on **November 8, 2019**.  Wynn Resorts/WLV was then set to issue another conditional payment ("donation") to the LACSN in **April 2020**.  The "donations" from Wynn Resorts/WLV, which were paid to the LACSN in **April 2019 and April 2020**, were set forth in the MOU, which was entered into in 2017.  However, Section 5 of the MOU expressly provided that the "donations" were revocable in Wynn Resorts'/WLV's sole discretion.

24.     On information and belief, the RICO Defendants intended to use these payment arrangements to influence Buckley to elevate Youchah to the Nevada District Court while Youchah's dispositive motion was pending, and to improperly influence the Nevada Matter.  Indeed, Judge Du, even if unaware of the RICO Defendants coordination, rendered a decision favorable to Youchah (who was then Judge Du's new colleague and someone with presumably "greater credibility" due to her new position as a Judge in the same Court).  The RICO Defendants have an established pattern of engaging in conduct where "donations" are used to influence official decisions and specifically, **where payments and other illicit behavior is used for the purpose of obtaining and retaining casino licenses**.

25.     The RICO Defendants initially withheld information about the Limcaco Sexual Assault Report from the NGCB, so as not to disturb their casino licenses in Nevada.   The RICO Defendants violated the Act by withholding information about their partnership with FBT (and specifically, Lightbody) and regarding information about the Limcaco Sexual Assault Report **to illicitly obtain gaming licenses in Massachusetts**.   The RICO Defendants also withheld

information about the Limcaco Sexual Assault Report when it came to light in the Okada litigation in **2016** (**so as not to disturb their gaming license in Massachusetts**).   The Okada Litigation itself originated out of the RICO Defendants' affiliation with Okada (Wynn Resorts' co-founder and former Vice Chairman), **who used bribes to obtain a gaming license in the Philippines (which involved Steve Wynn)**.  The RICO Defendants were also investigated by the SEC over their "donation" to the University of Macau Development Foundation (**whose Chancellor was a government official with the power to influence a decision on a gaming license in Macau, China**).

26.    The revelations about the Limcaco Sexual Assault Report (emanating from the WSJ Expose) threatened the gaming licenses in Massachusetts and **the RICO Defendants used payment arrangements in an effort to influence a decision in the Nevada Matter and to retain the licenses**.  The RICO Defendants' illicit activity tied to the gaming licenses in Massachusetts occurred **from 2012 through around April 2020**.   There is a threat of repeated conduct, as Wynn Resorts continues to be one of the largest employers in Las Vegas, Nevada and is a repeated named defendant in matters pending in the Nevada District Court.  The LACSN has close ties to the Nevada District Court, as it is the primary recipient of pro bono cases referred from the same Court.   Buckley continues to maintain a deep relationship with both the Nevada District Court and Wynn Resorts.   Sinatra remains on the LACSN's board of directors.   Maddox and Wynn Resorts continue to be monitored by Miller & Chevalier due to the threat of repeated misconduct.   Steve Wynn remains under investigation for his ties to public corruption.

27.    Indeed, in **August 2017**, Steve Wynn and Elliot Broidy ("Broidy"), both top Republican National Convention ("RNC") fundraisers at the time, called President Donald Trump from Steve Wynn's yacht to check on the status of Guo

Wengui, a Chinese businessman living in the United States, whose removal Broidy was seeking on behalf of the Chinese government.  On **October 20, 2020**, Broidy plead guilty to one count of conspiracy to violate the Foreign Agents Registration Act.  Between **March 2017 and January 2018**, Broidy agreed to lobby the President of the United States, the Attorney General and other high-level officials in the Administration and the DOJ to drop civil forfeiture proceedings and related matters concerning the embezzlement of billions of dollars from 1Malaysia Development Berhad (1MDB), a strategic investment and development company wholly owned by the government of Malaysia.  Broidy also agreed to lobby the Administration and the DOJ on behalf of the People's Republic of China, to arrange for the removal and return of Guo Wengui.  Broidy concealed from the officials whom he lobbied that he was being paid millions of dollars for his efforts (here, he was paid $9 million).  Steve Wynn was directly involved in these acts, as noted above.

28.    The RICO Defendants have a long history of illegal conduct and the threat of further illicit conduct is evident from investigations and oversight that remains in place at present.

## II.    JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under RICO.

30.    Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 1965(b), which provides for nationwide jurisdiction. *Butcher's Union Local No. 498 v. SDC Investments, Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).  Defendants are also subject to personal jurisdiction because Steve Wynn transacts business in the State of California, as he owns a residence located at 1210 Benedict Canyon Drive, Beverly Hills, California 90210.  Wynn Resorts also receives substantial revenue from the State of California.  Due process is satisfied, as each of the Defendants have

sufficient minimum contacts with the United States. *Rolls-Royce Corp. v. Heros, Inc.*, 576 F.Supp.2d 765, 782 (N.D. Tex. 2008).

31.     Venue is appropriate in this district pursuant to 18 U.S.C. § 1965(b) because Limcaco, a resident of the State of California, is a person injured in her business or property by reason of a violation of 18 U.S.C. § 1962 and the ends of justice require that the Defendants be brought before this Court.

### III.     THE PARTIES

32.     Plaintiff Angelica Limcaco is an adult of legal age residing in Los Angeles, California.  Limcaco resided in Los Angeles, California when the Nevada Matter was filed and when the Defendants attempted to influence the decision in the Nevada Matter through payments to the LACSN in its overall effort to retain its casino license on the Wynn Boston Casino.

<u>The RICO Defendants</u>

33.     Defendant Wynn Resorts, Ltd. ("Wynn Resorts") is a Nevada corporation with its principal place of business at 3131 Las Vegas Blvd. South, Las Vegas, Nevada, which directly or through subsidiaries, operates casinos in Las Vegas, Massachusetts and Macau, China.  Wynn Resorts' business is substantially supported by tourism to Las Vegas, Nevada and the company receives significant revenue as a result of tourism from California to Nevada.  For instance, the WSJ reported on August 20, 2020 that, "Wynn's Las Vegas resorts were receiving 4,000 reservations daily when they reopened with limited occupancy and other pandemic safety measures in June, but as Covid-19 cases rose sharply in **California and Arizona, reservations declined by 25% after the July 4 holiday**."[4]

---

[4] The WSJ article entitled "Wynn Resorts Revenue Drops Nearly 95%" is dated August 4, 2020 and is authored by Katherine Sayre.

34.     Defendant Steve Wynn is a resident of the State of Nevada and owns a residence located in the State of California with an address of 1210 Benedict Canyon Drive, Beverly Hills, California 90210.  Wynn was the CEO of Wynn Resorts until his forced resignation in February 2018 due to his exposure as a serial sexual predator and was similarly forced to resign as the Chairman of the Republican Finance Committee on January 27, 2018 in connection with the same.  Wynn was the CEO at the time the Limcaco Sexual Assault Report was sent to the company's HR department and the public revelation of the circumstances surrounding this report was the primary basis for Wynn's resignation in 2018.  Steve Wynn was also the CEO of Wynn Macau, Ltd. (a majority owned subsidiary of Wynn Resorts) ("Wynn Macau"), from September 2009 until his resignation in February 2018.  Wynn was the CEO of both Wynn Resorts and Wynn Macau during a period when (a) Okada used a ledger account through his company, Universal Entertainment Group ("Universal," which owned about twenty percent (20%) of Wynn Resorts' stock at the time), to make illicit payment to gaming officials in the Philippines **for purposes of securing a gaming license in the Philippines**; and (b) when Wynn Resorts committed a donation to the University of Macau Development Foundation (**in connection with its casino license in Macau**) that was the subject of a criminal investigation.  **Wynn also played an active role in obtaining the gaming license for the Wynn Boston Casino**, traveling to Massachusetts on multiple occasions (personally and improperly) and withholding information from the MGC about the Limcaco Sexual Assault Report and other allegations against him concerning sexual misconduct (in violation of the Act).  **Wynn's omissions to the MGC helped secure the license for the Wynn Boston Casino and the omissions were therefore made for the purpose of improperly obtaining a casino license**.  Wynn was a named defendant in the Nevada Matter.

35.     Defendant Matthew or "Matt" Maddox ("Maddox") is a resident of the State Nevada, who joined Wynn Resorts at its founding in 2002.  Since joining Wynn Resorts in 2002, Maddox has served as Wynn Resorts' Senior Vice President of Business Development and Treasurer, as the Chief Financial Officer of Wynn Resorts (Macau), S.A., and as Wynn Resorts' Treasurer and Vice President-Investor Relations.  Maddox was Wynn Resorts' CFO from March 2008 to May 2014, during a time when the United States initiated criminal investigations into the company concerning (a) the $135 million donation to the University of Macau Development Foundation and, (b) the payments totaling approximately $110,000 (from 2008 to 2011) involving Okada and various gaming officials in the Philippines.  Maddox became the President of Wynn Resorts in November 2013 and became the CEO of Wynn Resorts on February 6, 2018, following Steve Wynn's resignation (Maddox joined Wynn Resorts' board of directors on August 3, 2018).  **Maddox was employed by Wynn Resorts when Limcaco submitted the Limcaco Sexual Assault Report to the company's HR department and was also actively involved in acquiring the license for the Wynn Boston Casino**.  Maddox withheld his knowledge about the events surrounding the Limcaco Sexual Assault Report from the MGC in his **effort to maintain Wynn Resorts' casino license in Massachusetts** (until he was forced to address these issues when the WSJ publicly uncovered these events in January 2018 via the WSJ Expose).  Maddox was the CEO of Wynn Resorts during (a) the entire pendency of the Nevada Matter; (b) when Wynn Resorts issued a conditional payment ("donation") to the LACSN in April 2019; (c) when Youchah (WLV's lead counsel in the Nevada Matter) was elevated as a Magistrate prior to a decision being rendered on the Nevada Matter; (d) when Wynn Resorts thereafter sponsored the LACSN's annual awards in December 2019; and (e) when Wynn Resorts issued a conditional payment ("donation") to the LACSN in April 2020.  Maddox actively lead Wynn Resorts' campaign to retain its license in

Massachusetts and was fined $500,000 by the MGC on or around April 30, 2019 for his role in failing to report and investigate sexual assault allegations against Wynn. Pursuant to the MGC's decision on April 30, 2019, Miller & Chevalier, a Washington D.C. law firm specializing in white collar investigations, bribery, public corruption and violations of the FCPA, has been installed for a period of approximately five (5) years to oversee Maddox and the company.

36.    Defendant Kimmarie Sinatra ("Sinatra") is a resident of the State Nevada and was, until terminated in July 2018, the General Counsel and Executive Vice President of Wynn Resorts.  Sinatra was functionally the second most senior member of the Wynn Resorts' team after Steve Wynn himself, and had much broader power and responsibilities than is typical for a public-company general counsel.  Her separation agreement with Wynn Resorts filed with the SEC explicitly provided that she was contractually obligated to the company through December 31, 2018 (which directly coincided with Buckley's appointment to the merit selection panel on December 3, 2018).  This merit selection panel ultimately elevated Youchah to the vacancy of the Magistrate in the Nevada Matter (noting that Youchah simultaneously represented WLV in the Nevada Matter).  Sinatra also works closely with Buckley, as Sinatra is on the LACSN's board of directors and was a part of a group that donated $250,000 to the LACSN.  Sinatra signed the MOU between Wynn Resorts and the LACSN regarding an aggregate donation of $500,000.  The MOU was dated August 8, 2017, **but provided for five (5) separate payments of $100,000, which were each revocable in Wynn Resorts' sole discretion (meaning each payment was separate and revocable/conditional)**.

///

///

///

///

18

## IV.    FACTUAL ALLEGATIONS

### A. <u>The RICO Defendants Silenced Limcaco for Reporting a Rape Allegation Against Steve Wynn and Hid the Report from the Nevada Gaming Control Board to Retain Their Casino Licenses in Nevada</u>.

37.    Around **July 2005**, Limcaco (a resident of the State of California and the initial whistle-blower on Steve Wynn), reported to human resources ("HR") that Andrea (a manicurist and one of Limcaco's employees) had been raped and impregnated by Wynn. Within about twenty-four hours, Limcaco was called into her superior, Doreen Whennen's ("Whennen") office, who castigated Limcaco and threatened her to remain silent about the rape allegations. Limcaco attempted to explain that she was merely following protocol, as she was trained to do. Whennen threatened, "**let me make this clear to you – this is how it works here – all reports go to me first – especially anything concerning Steve Wynn**." Whennen admonished Limcaco to never speak about the rape incident again. Whennen told Limcaco that her assistant, Carolyn, was going to be fired in connection with reporting the rape allegation to Limcaco.

38.    Andrea abruptly vanished the day of the reported rape in **July 2005** and was never heard from again. Several employees, including the then-artistic director, Jorgen Nielsen ("Nielsen"), attempted to contact Andrea, but she had disappeared. Given the nature of the rape allegations against Steve Wynn (in connection with Whennen's threat and Andrea's abrupt removal without explanation), Limcaco was concerned that Andrea had been kidnapped or murdered (and was similarly concerned that the same would happen to her if she came forward). In reality, Steve Wynn and Wynn Resorts took overt steps to abruptly remove Andrea without explanation to (in part) induce Limcaco to fear for her safety.

39.     Limcaco and other employees knew that taking action against Steve Wynn resulted in being blacklisted in the gaming industry and elsewhere.   Nielsen informed Limcaco that a story was going to be published in a local Nevada newspaper about a girl who disappeared on a boat with Steve Wynn.   Nielsen informed Limcaco that Steve Wynn bought the newspaper and killed the story.

40.     In 2005-2006, several other employees reported sexual assault incidents involving Steve Wynn to Limcaco, including Elizabeth Mayer, Jennifer Martinez and Tiffany Camboris.   Various employees were abruptly removed by Steve Wynn and other agents of Wynn Resorts and never heard from again after making allegations of sexual assault against Wynn.   Limcaco was told by multiple people that Steve Wynn was more powerful than the police and he had bodies buried in the desert.   Limcaco reasonably believed Steve Wynn operated outside of the law.

41.     As Whennen demanded, Limcaco subsequently brought multiple allegations of sexual assault to Whennen's attention, but Whennen took no action. After meeting with then-president and COO of WLV, Andrew Pascal (Elaine Wynn's[5] nephew), Limcaco was abruptly terminated and blacklisted.   Limcaco was unable to find work and was forced into bankruptcy.   Limcaco was concerned for her personal safety because WLV and Steve Wynn took affirmative steps to remove Andrea after reporting to Limcaco that Steve Wynn raped her.

42.     Due to Andrea's abrupt removal after the rape allegation, Whennen's threat, Limcaco's abrupt termination for reporting sexual assault and Limcaco's blacklisting and bankruptcy, Limcaco believed she would be followed, kidnapped and/or murdered for coming forward.   Limcaco subsequently entered treatment for post-traumatic stress disorder and was prescribed various medications to address

---

[5] Elaine Wynn was married to Steve Wynn at the time (in or around 2005 – 2006) and is now Steve Wynn's ex-wife.

these traumatic events.  Defendants subsequently engaged in numerous intimidation tactics including following individuals who were coming forward against Steve Wynn, as further discussed herein.  Defendants have also since been openly and notoriously investigated for ties to organized crime, as further discussed below. Defendants not only orchestrated Andrea's abrupt removal in order to induce Limcaco to believe that Andrea had been kidnapped or murdered (and that the same would happen to Limcaco if she came forward), but the RICO Defendants intentionally withheld the Limcaco Sexual Assault Report from the Nevada Gaming Control Board in order to maintain their casino licenses in Nevada without interruption.  The RICO Defendants then withheld information about the Limcaco Sexual Assault Report in order to obtain their casino licenses in Massachusetts.

### B. The RICO Defendants Committed Multiple Criminal Acts in Order to Obtain Casino Licenses in Massachusetts Including Predicate Acts Tied to the Limcaco Sexual Assault Report.

#### 1. The Massachusetts License Application Process.

43.    On November 22, 2011, the State of Massachusetts passed the Massachusetts Gaming Act (the "Act," as defined above), which created a process for the development of three destination resort casinos in Massachusetts, one in each of three geographic regions.  Region A covered the greater Boston area, including Suffolk, Middlesex, Essex, Norfolk, and Worcester Counties.  In order to operate a casino, a prospective operator was required to apply to the newly formed MGC for a "Category 1"[6] gaming license ("License"). M.G.L. c. 23K § 19(a)(1).

---

[6] Category 1 permitted the operation of a casino.  Only one such Category 1 "license" was to be permitted in each Region.

44.     The Act was the fruition of more than two decades of intense political debate in Massachusetts and contains numerous provisions aimed at fighting organized crime and preventing its infiltration into Massachusetts casinos.  Among those provisions intended to prevent criminals from profiting from any casino business, is the requirement that applicants disclose "…**the location of the proposed gaming establishment…and ownership interests over the past [twenty] years, including all interests, options, agreements in property**" M.G.L. c. 23K § 9(a)(15) (emphasis added).

45.     Applicants were to be pristine in their relationships.  The Act requires that "[i]n evaluating the suitability of the applicant, the commission shall consider the overall reputation of the applicant including, without limitation… (6) **the suitability of all parties in interest** to the gaming license, i**ncluding affiliates and close associates** and the financial resources of the applicant." M.G.L. c. 23K § 12(a)(6) (emphasis added).

46.     In making sure that the Massachusetts Gaming Commission (the "MGC") is able to properly evaluate applications, the Act provides: "**Whoever willfully resists, prevents, impedes, interferes with to makes any false, fictitious or fraudulent statement or representation to the bureau, commission** or division or to agents of employees of the bureau, commission or division in the lawful performance of the agent's or employee's duties under this chapter **shall be punished by imprisonment in the state prison for not more than 5 years or in the house of correction for not more than 2 ½ years or by a fine not to exceed $25,000, or both**" M.G.L. c. 23K § 38 (emphasis added).

47.     The License application process was organized into two separate phases.  In Phase 1, the MGC's Investigations and Enforcement Bureau (the "IEB") investigated the applicants' suitability in matters pertaining to finance and integrity.  The applicants, anyone with a financial interest in the applicants' business, close

associates of the applicants and all persons owning five percent (5%) or more of common stock of any applicant were subject to the suitability investigation.  Once the IEB and MGC determined that an applicant was a suitable candidate for the License, the applicant would move to Phase II of the application process.  In Phase II, the applicants submitted to the MGC a site-specified proposal addressing issues related to finances, economic development, building and site design and mitigation for the proposed casino project.  The MGC considered these materials, sought additional information from the applicants as necessary, and, ultimately, held a vote to award the License to the applicant with the best proposal.

## 2.  FBT Background.

48.     In **2009** (a few years prior to the passing of the Massachusetts Gaming Act), FBT purchased the Everett Site.[7]  Of FBT's five original equity owners, two of those owners had criminal histories.  Lightbody was convicted of grand larceny and identity theft in 2007.  Over the years, Lightbody has separately been charged with ten assaults, three counts of illegal weapons possession, and two counts of witness intimidation.  Lightbody is also known to be associated with the New England Family of La Cosa Nostra.  Additionally, DeCicco was convicted of multiple counts of mail fraud related to insurance claims he filed in connection with suspicious fires on his personal property.

49.     Lightbody had close ties with the Mayor of Everett, Massachusetts, Carlo DeMaria.  In or around the **fall of 2009**, at the suggestion of Mayor Demaria, the owners of FBT gave a three percent (3%) non-equity interest in FBT to Jamie Russo.  Russo was an "affiliate" of Lightbody and a consultant for Mayor Demaria.  On information and belief, the purpose of giving Russo an interest in FBT was to

---

[7] The Everett Site is the physical location of the Wynn Boston Casino.

pass on to Mayor Demaria some of the proceeds from any future sale of the Everett Site.  Russo also had a criminal history.  In 1992, Russo plead guilty to a charge of fourth-degree larceny (a misdemeanor) after being caught using forged and stolen credit card numbers at a casino in Connecticut.

3.  Wynn-FBT Partnership.

50.    Wynn Resorts was interested in obtaining a gaming license in the State of Massachusetts from at least around **2012**.  Initially, Wynn Resorts partnered with Robert Kraft, the principal owner of the New England Patriots, to seek a license for a casino in Foxborough, Massachusetts.  However, this partnership failed in or around **May 2012**, when it became clear that the Town of Foxborough would not approve the prospective casino project.

51.    In or around the **late summer or fall of 2012**, Wynn Resorts began to explore a partnership with FBT.  Representatives for Wynn Resorts and FBT met at the Everett Site for the first time in **November 2012**.  At this meeting, FBT owner DeNunzio informed Sinatra and Maddox that "an individual with a checkered past" was then an owner of FBT, but that he was taking steps to give up his interest.  Later that month, Wynn Resorts agreed to pay $100,000 per month for an option to purchase the Everett Site for $75 million if and when Wynn MA, LLC ("Wynn MA") (a subsidiary of Wynn Resorts that operates the Wynn Boston Casino) received the License.

52.    During the legal due diligence process conducted in **December 2012**, Mayor Demaria informed a lawyer/lobbyist for Wynn Resorts that Lightbody had a criminal history.  FBT's lawyers separately told Wynn Resorts' lawyers that at least one FBT owner had a criminal history.  Additionally, on **December 14, 2012**, the Boston Business Journal reported that DeCicco was a convicted felon and that he appeared on FBT corporate paperwork that had been publicly filed earlier in 2012.

Wynn Resorts took no further steps at this point to investigate the ownership history of the Everett Site after DeCicco's criminal record was publicized.

53.     On or around **December 19, 2012**, Wynn Resorts and FBT formalized their option agreement in writing (the "Option Agreement").  In addition to setting the purchase price for the Everett Site, the Option Agreement provided that FBT would collaborate with Wynn Resorts and Wynn MA on the development of the property, including in the context of obtaining subdivision approvals, permits, and a permanent road easement and performing environmental remediation.  The Option Agreement also contained the representation that "[t]o the best of [FBT's] knowledge, neither [FBT] nor any Person associated with [FBT] has ever engaged in any conduct or practice which any of the foregoing Persons should reasonably believe would cause such Person to be" deemed unsuitable by the MGC.  The RICO Defendants knew this representation was false due to FBT's association with Lightbody, DeCicco and, possibly, Russo.  Around the same period, the RICO Defendants reached "a mutual understanding" that FBT would create whatever false and backdated paperwork might be necessary for purposes of Wynn MA's License application.  **Maddox and Sinatra consulted directly with Steve Wynn before making this deal with FBT**.

54.     In **January 2013**, DeNunzio created a backdated 2012 operating agreement for FBT (the "Backdated Operating Agreement"), which falsely indicated that DeCicco did not have an ownership interest in FBT as of January 2012.  The Backdated Operating Agreement claimed that DeCicco had transferred his interest to Gattineri.  However, prior to the creation of the Backdated Operating Agreement, DeCicco already had executed a Memorandum of Transfer dated "April __ 2012," in which he transferred the entirety of his interests to Lightbody.  On **January 17, 2013**, Denunzio emailed Sinatra purporting to confirm that the only equity holders of FBT were himself, Lohnes, and Gattineri.  Eleven days later, on **January 28, 2013**,

DeNunzio arranged for Gattineri and Lightbody to execute a Memorandum of Transfer, backdated to **December 14, 2012**, memorializing Lightbody's transfer of his interest in FBT to Gattineri for a $1.7 million promissory note.

### 4. Wynn MA's License Application.

55.    On or about **January 15, 2013**, Wynn MA submitted its initial suitability application materials for the license regarding the Wynn Boston Casino to the MGC.  Wynn Resorts, Ltd. similarly filed an RFA-1 application as the parent company/qualifier of Wynn MA.  Various individuals, including Steve Wynn, Sinatra and the then-members of the Wynn Resorts' board of directors, filed RFA-1 applications as individual qualifiers based upon their respective roles with Wynn Resorts, Ltd.  **Steve Wynn, Maddox and Sinatra were each involved in preparing, submitting and/or directing the preparation and submission of the application materials**.

### i.    *Lightbody's Involvement*.

56.    Shortly after Wynn MA submitted its application materials to the MGC, the IEB began investigating the Everett Site's suitability of Wynn MA.  During the investigation, the MGC was advised by the FBI that wiretaps in an unrelated case suggested that Lightbody maintained a concealed ownership interest in FBT (as discussed above).  When FBT learned in **July 2013** that the IEB was investigating Lightbody's ownership interest in FBT, Denunzio created a new backdated Memorandum of Transfer showing that Lightbody had transferred his interest in FBT to Gattineri as of **August 15, 2012** (four months prior to the RICO Defendants entering into the Option Agreement).  Pursuant to their "mutual understanding," however, Sinatra and the other RICO Defendants knew that these documents had been falsified for the purposes of Wynn MA's License application.

57.    **In July 2013, Sinatra and Maddox also sat for an under-oath interview with the IEB**.  In those interviews, each of Sinatra and Maddox claimed to

have never heard of Lightbody.  They also claimed to be unaware of any owners of FBT other than Lohnes, DeNunzio and Gattineri.  Maddox testified that it was "[n]ot my job" to know whether a person with a criminal background was involved in the deal with FBT.  Subsequently, in his **September 9, 2013** interview with the IEB, Steve Wynn claimed that both Maddox and he had "zero" knowledge of the fact that certain members of the FBT ownership group had criminal backgrounds.  Sinatra also testified that she had "zero" knowledge of that fact.  During the same interview, Steve Wynn stated, in pertinent part, "[c]riminal activity is criminal activity…[a]nd there's no place for it in a relationship with us.  And if we're sloppy and we allow people who are engaged in criminal activity to do business with us, we should be criticized for it and held responsible."

58.    However, the RICO Defendants maintained a relationship with Lightbody throughout **2012, 2013 and into 2014**.  In the **Spring of 2013**, the RICO Defendants were attempting to purchase a small piece of property adjacent to the Everett Site.  The owner of the property was reluctant to sell and told Maddox that he would only deal with Lightbody.  Maddox requested that DeNunzio help, and DeNunzio then reached out to Lightbody.  Maddox then met with Lightbody at least twice in the **Spring of 2013**, and DeNunzio and Lightbody eventually convinced the owner in **June 2013** to agree to an option on a long-term lease of the property to an affiliate of Wynn Resorts.  Additionally, in **June 2013**, Lightbody worked with Wynn employees to generate public support in Everett for Wynn MA's casino proposal.

59.    Maddox and Sinatra had primary responsibility within the Wynn organization for overseeing the Everett referendum process and knew of Lightbody's involvement.  On or around **June 22, 2013**, Everett voters approved Wynn MA's

public proposal.  And, **throughout 2013 and 2014**, Lightbody campaigned against the Mohegan Sun Massachusetts[8] ("MSM") casino project, spending thousands of dollars of his own money on signs and advertising supporting the anti-Sterling Suffolk Racecourse (MSM's partner) side of the public referendum in Revere and donating to the "No Eastie Casino" campaign that sought to block the MSM casino project.  Lightbody was even arrested in **October 2013** for physically assaulting a participant at a pro-MSM rally in Revere.

60.     On **November 21, 2013**, the Boston Globe published a story revealing Lightbody's concealed interest in the Everett Site.  On the same day, the RICO Defendants announced that they had negotiated an amendment to the Option Agreement that reduced the exercise price from $75 million to $35 million to eliminate the so-called "casino premium."  However, the Option Agreement shifted the other financial obligations from FBT to Wynn MA and Wynn Resorts, which offset the reduction in the exercise price.

ii. *Wynn MA's Suitability Hearings*.

61.     On **December 13, 2013**, the MGC held a hearing to address concerns about the ownership of FBT.  At the hearing, Sinatra testified that she had been "shocked" and "surprised" when she learned in the **summer of 2013** that FBT's ownership included convicted criminals and she complained that "it's awfully hard if people are running around and not telling you the truth."  The RICO Defendants claimed that they had acted in good faith and had not learned of the criminal element in FBT's ownership until after they entered into the Option Agreement.  To cure the problem, the RICO Defendants renegotiated the Option Agreement and offered to provide signed confirmations of ownership from FBT's owners.  Accordingly, the

---

[8] Mohegan Sun Massachusetts competed for a gaming license that was ultimately awarded to Wynn MA (a subsidiary of Wynn Resorts) et al. Sterling Suffolk Racecourse, LLC was partnered with MSM.

MGC voted to approve the amended Option Agreement at the **December 13, 2013** hearing.

62.    On **December 16, 2013**, the MGC held another hearing (this time to consider the suitability of Wynn MA for the License).  On **December 23, 2013**, the RICO Defendants provided the MGC signed confirmations of ownership from Lohnes and DeNunzio.  The signed confirmations disclosed for the first time that Russo also held a three percent (3%) interest in the proceeds from any sale of the Everett Site.  The signed confirmations, however, did not disclose that Gattineri still owed Lightbody $1.7 million pursuant to the promissory note exchanged for Lightbody's interest in FBT, which would be paid from the proceeds of the sale of the Everett Site.  Regardless, on **December 27, 2013**, the MGC issued a favorable Phase I suitability decision with respect to Wynn MA.

iii. *Gattineri's Ownership Confirmation.*

63.    Unlike Lohnes and DeNunzio, Gattineri did not provide a signed confirmation before the MGC voted on the suitability of Wynn MA.  The MGC set a deadline of **June 2014** for Gattineri to provide his signed confirmation.  Gattineri initially refused to sign the confirmation because of the reduction of the Option Agreement's exercise price that the RICO Defendants had agreed to in **November 2013**.

64.    In order to change Gattineri's mind, the RICO Defendants sent their "operative," Robert DeSalvio, to California to meet with Gattineri in person.  There, DeSalvio reached a secret side agreement with Gattineri, which promised to pay him the difference between the original exercise price and the revised exercise price for his share of the Everett Site (here, approximately, $1.9 million).  Gattineri then signed the confirmation stating that he had "not mortgaged, pledged, or assigned [his] own interest in the Company, nor [had he] granted to any person or entity an option, warrant or other right to [his] interest in the Company or the economic interests

represented hereby, in whole or in part."   Gattineri's confirmation still did not disclose the promissory note that he had given to Lightbody.  Gattineri later admitted that if he failed to pay the note according to its terms, Lightbody would be able to take back his equity interest in FBT.

> iv.   *The RICO Defendants Intentionally Withheld Information from the MGC Regarding the Limcaco Sexual Assault Report in an Effort to Obtain the Massachusetts Casino Licenses.*

65.   In direct connection with Defendants' actions concerning FBT (**regarding their concerted effort to illicitly obtain a casino license in Massachusetts**), the RICO Defendants also intentionally withheld information from the MGC regarding the Limcaco Sexual Assault Report.  On **July 30, 2013**, Sinatra told the IEB, "there's a regulatory standard and then there's an 'us' standard.  And we've generally considered ourselves to have a higher standard of probity with respect to people that we employ.  On **December 16, 2013**, Steve Wynn told the MGC, "our history in Las Vegas has been exemplary, spotless in every regard."  At the same meeting, Sinatra told the MGC, "the idea of compliance is that it needs to be an essential part of your corporate culture…[o]ne of the hallmarks and essential features of a successful compliance program is what the books will tell you is the tone at the top.  I think that you probably got an idea from our tone at the top from Mr. Wynn's presentation."  Additionally, the RFA-2 submitted by Sinatra on behalf of Wynn MA on **December 31, 2013** stated, "Wynn Resorts is fully committed to full and complete regulatory compliance in every jurisdiction in which it operates" and that the proposed casino at the Everett Site would "be an extension of and leverage Wynn Resorts' extensive experience and best practices in implementing, performing and integrating internal controls."  Defendants failed to address the Limcaco Sexual Assault Report and/or any other details about Steve Wynn's pattern

of sexual assault, until the MGC initiated an investigation beginning around **February 2018**, as more fully addressed herein.

vi. *License Award*.

66.     On or around **September 16, 2014**, the MGC awarded the Region A, Category 1 gaming license to Wynn MA.  On or around the same date, the MGC signed a conditional agreement to award the license to Wynn MA.  Wynn Resorts submitted a response to the MGC's proposed conditions for licensing which affirmatively represented its acceptance of the condition to "compl[y] with all applicable federal, state and applicable and lawful local laws, rules and regulations, now in effect or as hereafter promulgated or amended."  However, within weeks of a casino license being awarded to the RICO Defendants in Massachusetts, on **October 2, 2014**, the DOJ indicted Lightbody, DeNunzio and Gattineri for their role in concealing Lightbody's financial interests in FBT from Massachusetts gaming regulators (in connection with FBT's partnership with Wynn Resorts).  Lightbody, DeNunzio and Gattineri were charged with conspiracy to commit wire fraud, wire fraud and aiding and abetting.

67.     In **November 2014**, pursuant to the amended Option Agreement, Wynn MA acquired the Everett Site.  Wynn MA commenced construction after obtaining the required permits and approvals and an opening date was ultimately scheduled for **June 2019**.  The project's ultimate cost is estimated to have been **$2.6 billion**.

vii.  *The RICO Defendants' Post-License Failure to Advise the MGC of the Limcaco Sexual Assault Report and Additional Ties to Bribery Schemes Aimed at Obtaining Casino Licenses*.

68.     The RICO Defendants similarly failed to advise the MGC of the Limcaco Sexual Assault Report, when the allegations were revealed by Elaine Wynn

in the Okada Litigation.  On or around **February 18, 2012**, Wynn Resorts filed a lawsuit against its co-founder and then-Vice Chairman, Okada, and Okada's companies Aruze USA, Inc. ("Aruze") and Universal.  The Okada Litigation was centered around allegations against Okada for violations of the Foreign Corrupt Practices Act (the "FCPA").

69.   The genesis of the Okada Litigation was a forty-seven (47) page report prepared by Louis J. Freeh, the fifth Director of the FBI outlining (amongst other issues) about thirty-eight (38) payments totaling $110,636.36 to various members of the Philippines Amusement and Gaming Corporation (the "PAGCOR"), who oversaw Okada's attempts to obtain a casino license in the Philippines (the "Freeh Report," or "Exhibit B").  Steve Wynn was directly involved in this process and Okada sought a casino license in the Philippines by consulting with Steve Wynn, inviting Steve Wynn to the Philippines and also entertaining various PAGCOR members at Wynn Macau, etc.

70.   The United States ultimately moved to intervene in the Okada litigation on **April 8, 2013**.  The United States specifically noted that, "…**Okada-controlled companies [paid] up to $40 million in bribes…in order to secure benefits from [PAGCOR]**…" (emphasis added).  Pursuant to its motion to intervene, the United States also addressed a donation in the amount of around $135 million made by Wynn Macau to the University of Macau Development Foundation (connected to certain Wynn Resorts' land deals and casino licenses in Macau).  Specifically, the United States Attorney's Office stated:

> Okada, Aruze USA, and Universal filed a counterclaim…**against Wynn Resorts**…which includes allegations of **improprieties concerning a donation made by Wynn Macau…to the University of Macau Development Foundation, consisting of a $25 million payment made in May 2011, and a commitment for additional**

**donations of $10 million each year for 10 years…the government has also been conducting a criminal investigation into that conduct**[9] (emphasis added).

71.     The circumstances surrounding the Limcaco Sexual Assault Report became a central issue in the Okada Litigation. Elaine Wynn failed to gain re-election to the Wynn Resorts' board of directors on **April 24, 2015**. On **March 28, 2016**, Elaine Wynn, acting as a cross-claimant in the Okada Litigation, filed a Fifth Amended Complaint. The cross-claim alleged that Steve Wynn had engaged in "reckless risk-taking behavior" and made reference to the existence of a settlement in 2005.[10] Maddox learned of the 2005 settlement shortly after the cross-claim was filed.

72.     In **2017**, Steve Wynn and Whennen were deposed in connection with the Okada Litigation. Sinatra was present for each of their depositions. At each

---

[9] In **2006**, Wynn Resorts opened a hotel in Macau under a land concession agreement granted by the Macau government, with a **term running from 2002 to 2022**. In **February 2006**, the Company announced that it had submitted an application to the Macau government for a second land concession agreement to build a new casino resort. After five (5) years, the second land concession agreement still had not been approved. In **May 2011**, at Steve Wynn's instigation, the Wynn Resorts' board of directors (with the exception of Okada), approved a **$135 million "donation" to the University of Macau Development Foundation. The Macau "donation" was essentially an indirect bribe to the Chancellor of the University of Macau Development Foundation who was, coincidentally, head of the Macau government**. The SEC launched a probe, but ultimately decided to take no further action. However, in or around **April 2013**, Okada sent a demand letter to the Wynn Resorts' board of directors, which stated, in pertinent part, "[i]n **April 2011**, the Board met, discussed, and approved a pledge by Wynn Macau…to donate (roughly $135 million) to the University of Macau Development Foundation, **at a time when Wynn Macau was seeking local government approval to develop a third casino. This donation is suspicious for a number of reasons, including its enormous size, the fact that the 10-year term of the pledge matches precisely the length of the casino license Wynn Resorts was seeking, and the fact that the lead trustee of the University of Macau Development Foundation also has a position in the Macau government which enables him to influence the issuance of gaming licenses.**"

[10] This settlement pertained to Steve Wynn's settlement with Andrea regarding her allegations that Steve Wynn had raped and impregnated her, which was the basis of the Limcaco Sexual Assault Report.

deposition, the testimony indicated that the Limcaco Sexual Assault Report (and related settlement) originated with a rape allegation against Steve Wynn.

73.     In **2017**, during preparation for his deposition in connection with the Okada Litigation, Maddox was informed that he may be asked about an assault having taken place as a part of the 2005 settlement (which originated from the Limcaco Sexual Assault Report).

74.     Although Maddox was already aware of the allegations connected to the Limcaco Sexual Assault Report, as a result of Elaine Wynn's 2016 amended cross-claim, these additional details provided him with a heightened awareness of the relevant events.  **Steve Wynn, Maddox and Sinatra failed to bring these issues to the attention of the MGC when they arose in 2016 and 2017, despite their ongoing obligation to maintain certain suitability requirements tied to Wynn Resorts' license for the Wynn Boston Casino**.

      C. <u>**The Wall Street Journal Uncovers the Limcaco Sexual Assault Report that was Intentionally Withheld from the MGC and the RICO Defendants Initiate an Aggressive Campaign to Salvage the Wynn Boston Casino Licenses.**</u>

75.     On **January 26, 2018**, the WSJ uncovered the Limcaco Sexual Assault Report and Steve Wynn's overall pattern of sexual misconduct in a report entitled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn" (the "WSJ Expose," as defined above).  The WSJ Expose reported:

> **[t]he 2005 allegations of the manicurist that led to the settlement were the most striking described by former employees**.  In this instance, a woman who was a salon manager at the time said she filed a written report to human resources.  She said she got a call from an executive, Doreen Whennen, castigating her for filing to HR and saying she should have taken the matter directly to Ms. Whennen.

76.     The NGCB and MGC immediately initiated sweeping investigations into Wynn Resorts, Steve Wynn, Maddox, Sinatra and others associated with the company.  On **January 30, 2018**, the WSJ reported:

> Nevada gaming regulators announced Tuesday that they are investigating sexual misconduct allegations involving casino mogul Steve Wynn, stemming from a Wall Street Journal investigation published last week….[t]he investigation comes as the **Massachusetts Gaming Commission is set to meet Wednesday to discuss allegations against Mr. Wynn, including a $7.5 million settlement paid to a manicurist who told people at the time Mr. Wynn forced her to have sex with him**.[11]

77.     Wynn Resorts risked losing its casino license on its $2.6 billion project in Massachusetts.  The WSJ reported on **January 31, 2018**,[12] that:

> [s]exual misconduct allegations against Steve Wynn are **threatening to derail Wynn Resorts Ltd.'s lucrative casino project in Massachusetts** as regulators revisit a contentious debate on the company's license to operate in the state…Massachusetts gambling commissioners expressed serious concerns about allegations against Mr. Wynn, including a $7.5 million settlement paid in 2005 to a manicurist who told people at the time that Mr. Wynn forced her to have sex with him.  **State gambling commissioners can revoke the Wynn license if they determine the allegations make Mr. Wynn not 'suitable' as a casino operator**.

78.     Since the MGC's investigation **threatened Wynn Resorts' license at Wynn Boston Casino**, the company began an extensive campaign to salvage its

---

[11] The WSJ article is entitled, "Nevada Gambling Regulator to Probe Steve Wynn Sexual Misconduct Allegations," is authored by Chris Kirkham and is dated January 30, 2018.

[12] The WSJ article (dated January 31, 2018) is entitled, "**Misconduct Allegations Against Steve Wynn Put Big Casino Project at Risk**," (emphasis added) and is authored by Susan Pulliam, Jon Kamp, Chris Kirkman and Kate O'Keefe.

license on its $2.6 billion project, which included attempting to influence the decision on the Nevada Matter through payments (noting the RICO Defendants prior history of using improper influence to obtain casino licenses), amongst some of the following actions:

    1.   <u>Steve Wynn's Resignation and Settlement of the Okada Litigation</u>.

    a.    On or around **January 27, 2018**, Steve Wynn was removed from his role as Republican National Committee Finance Chairman (noting that he obtained the position at the beginning of Donald Trump's Presidency).[13]  Steve Wynn was then forced to resign as Chairman and CEO of Wynn Resorts on or around **February 5, 2018**.[14]

    b.    Although Steve Wynn had resigned as Chairman and CEO of Wynn Resorts, he still retained a twelve percent (12%) ownership stake in the company as of **March 2018**, which **continued to threaten Wynn Resorts' efforts to retain its license for the Wynn Boston Casino**.  The WSJ reported on **March 8, 2018**[15] that:

> [o]n Thursday Wynn Resorts Ltd. took a step that could eventually allow [Steve Wynn] to end his status as the company's largest shareholder too.  His 12% stake has left him and **the company subject to additional scrutiny by regulators in Nevada and Massachusetts, who are investigating allegations that he engaged in sexual misconduct against employees**…But he has been prevented from

---

[13] The WSJ article is entitled, "Casino Mogul Steve Wynn Steps Down as RNC Finance Chairman," and is authored by Rebecca Ballhaus (and dated January 27, 2018).

[14] Around **February 7, 2018**, WSJ reported, "Steve Wynn, the billionaire casino visionary considered to be the architect of modern Las Vegas, resigned Tuesday as chairman and chief executive of his company **in the wake of sexual misconduct allegations** detailed in a Wall Street Journal investigation last month" (see "Steve Wynn Steps Down as Wynn Resorts CEO," by Chris Kirkham, Alexandra Berzon and Kate O'Keefe).

[15] The WSJ article is entitled, "Wynn Resorts to Pay $2.6 Billion in Settlement That Removes a Barrier to Steve Wynn Stake Sale," and is authored by Kate O'Keefe, Alexandra Berzon and Chris Kirkham (dated March 8, 2018).

selling his Wynn Resort's stock by a complex shareholder agreement among him, [Elaine Wynn] and [Okada]…[o]n Thursday, Wynn Resorts moved to resolve the standoff by agreeing to pay $2.6 billion to settle litigation with Universal Entertainment Corp., a Japanese company that was forced by Wynn in 2012 to give up its 20% stake in the casino giant, according to a statement from Universal's lawyers, Buckley Sandler LLP…**Wynn Resorts has been under increased pressure to resolve the Nevada legal dispute after a Wall Street Journal investigation published in January detailed allegations that Mr. Wynn sexually assaulted employees**.

c.    On **February 2, 2018**, Bloomberg[16] reported, "[t]he **settlement and the reason why it wasn't previously disclosed** will be part of the **Massachusetts Gaming Commission's investigation**…<u>**Regulators could suspend or revoke Wynn Resorts' license to operate in the state, jeopardizing the company's $2.4 billion casino.**</u>

d.    Wynn Resorts promptly settled the Okada Litigation in the wake of the WSJ Expose (which emanated from the circumstances surrounding the Limcaco Sexual Assault Report), so that Steve Wynn could sell his outstanding shares in the company.  These actions were all done by the RICO Defendants **in an effort to save the casino licenses in Massachusetts**. Wynn Resorts then took various additional steps **all in its desperate attempt to save the gaming licenses relating to its $2.6 billion casino project in Massachusetts**.

2. <u>Maddox Becomes CEO and Sinatra is Forced Out</u>.

a.    On or around **February 5, 2018**, Wynn Resorts named Maddox as the Wynn Resorts' new CEO.

---

[16] The Bloomberg article (dated February 2, 2018) is entitled, "Wynn's $7.5 Million Settlement Said to Involve Paternity Claim," and is authored by Christopher Palmeri.

b.      Wynn Resorts began to overhaul its board of directors, as the WSJ reported on **March 7, 2018** that then-board members Ray Irani and Alvin Shoemaker would step down.[17]

c.      On **July 15, 2018**, the WSJ reported that Sinatra, then-general counsel of Wynn Resorts (**who knew about the circumstances surrounding the Limcaco Sexual Assault Report,** as addressed above), would be removed from the company.[18]  Wynn Resort's filing with the SEC concerning Sinatra's separation agreement from the company (dated **August 3, 2018**), explicitly provided that Sinatra was contractually obligated to the company through **December 31, 2018**.

d.      On **December 14, 2018**, the WSJ reported that Maurice Wooden, then-president of WLV, was removed from the company.  The WSJ reported, "[a] top executive at Wynn Resorts Ltd…**who had been accused of enabling alleged sexual misconduct by former Chief Executive Steve Wynn** is leaving the company" (emphasis added).

---

[17] The WSJ article (dated March 7, 2018) is entitled, "Two Wynn Resorts Board Members Will Step Down," and is authored by Chris Kirkham.

[18] The WSJ article (dated July 5, 2018) is entitled, "Wynn Resorts General Counsel Kim Sinatra to Step Down," and is authored by Chris Kirkham and Kate O'Keefe.  The WSJ report provides, in pertinent part, "[a] top executive at Wynn Resorts Ltd…who knew for years about a $7.5 million settlement between former Chief Executive Steve Wynn and a casino employee intends to step down from her role."  The WSJ report further provides, in pertinent part, "**Wynn Resorts has been under heightened regulatory scrutiny** since The Wall Street Journal in January published an article detailing allegations of behavior by Mr. Wynn…[t]he Journal article also reported that he paid **a $7.5 million settlement to a manicurist at his Wynn Las Vegas resort, who in 2005 told people that Mr. Wynn had forced her to have sex with him**" (emphasis added).  Additionally, the WSJ report provided (in direct connection with the Limcaco Sexual Assault Report)," [r]egulators in Nevada and Massachusetts, where the company is building a $2.5 billion casino in the Boston area, have been investigating the allegations since the Journal's first article.  Chairman Stephen Crosby said **a central question is what others at Wynn Resorts, including other executives and the board of directors, might have known about the $7.5 million settlement**…<u>The company didn't disclose the settlement to Massachusetts regulators when Wynn Resorts originally applied for the Massachusetts license, a process in which Ms. Sinatra, as general counsel, was intimately involved</u>" (emphasis added).

e.    As further set forth below, after the Nevada Matter was filed (in **September 2018**), the RICO Defendants engaged in corrupt payments to the LACSN in an effort to directly or indirectly influence a decision in Limcaco's case.  The case was ultimately dismissed without leave to amend on **April 18, 2019**.  The dismissal directly coincided with (1) Youchah's (WLV's lead counsel) selection to fill the vacancy of Magistrate Foley (before a decision was rendered on the Nevada Matter); (2) the MGC's public hearing from **April 2, 2019 – April 4, 2019** regarding the MGC's ongoing suitability investigation into Wynn Resorts, Maddox et al. regarding licensing qualifications; and (3) the MGC's decision on **April 30, 2019** that Wynn Resorts would be fined a record $35 million, **but would be allowed to retain its license on its $2.6 billion project**.

### D. <u>**Limcaco Files Suit While the MGC is Investigating the RICO Defendants and the RICO Defendants Issue Illicit Payments in an Attempt to Corrupt the Judicial Process and Save the Casino Licenses**</u>.

79.    Limcaco filed suit in the United States District Court, District of Nevada on **September 4, 2018** against Wynn Resorts (substantially under a theory of violation of Title VII of the Civil Rights Act of 1964).  Limcaco filed a First Amended Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1), added claims against Steve Wynn (as she was unable to informally resolve her dispute with him) and correctly named her actual employer (WLV, as opposed to Wynn Resorts).

80.    Judge Miranda Du was the District Court Judge in the Nevada Matter and Magistrate George Foley was the assigned Magistrate Judge.  Steve Wynn was represented by Peterson and Baker of Peterson Baker PLLC (located in Las Vegas, Nevada) and WLV was initially represented by Youchah and Aquino (of Jackson Lewis in Las Vegas, Nevada).

81.     In Limcaco's first amended complaint (filed in the Nevada Matter), she substantially argued that the defendants in the Nevada Matter (Steve Wynn and WLV) were equitably estopped from arguing the statute of limitations as a defense (based on affirmative steps to intimidate Limcaco and stop her from coming forward).  WLV and Steve Wynn filed motions to dismiss the first amended complaint.

82.     After briefing on the WLV and Steve Wynn motions to dismiss closed on **December 26, 2018,** the NGCB and the MGC released extensive public reports, which substantiated Ms. Limcaco's claims (specifically in the context of threats to her personal safety).  The reports addressed a disparity in power between WLV, Steve Wynn and WLV employees; evidenced WLV and Steve Wynn's attempts to intimidate; and specifically, addressed WLV and Steve Wynn's efforts to immediately cover-up Andrea's rape allegations.  As soon as each document became publicly available, Ms. Limcaco promptly filed requests for judicial notice.

83.     On **April 18, 2019**, the Nevada District Court granted the WLV motion to dismiss and sided with WLV on all issues.  The Nevada District Court refused to consider the evidence submitted from the NGCB and the MGC.

84.     However, through thorough investigation, clear conflicts of interest between Wynn Resorts / WLV, Steve Wynn and certain individuals associated with the Nevada District Court (specifically, Buckley and her foundation, the LACSN) were discovered.  These conflicts of interest were never disclosed to Limcaco.  The following set of improprieties was initially uncovered in or around **February 2020** in connection with the timeline surrounding the Nevada Matter:

a.     The Nevada District Court Matter was filed on **September 4, 2018**.

b.      On or about **October 2, 2018**, **Peterson**[19] **and Donald J. Campbell** (**both longtime counsel to Steve Wynn**) were placed on a merit selection panel by the Nevada District Court along with **Buckley**.  This merit selection panel was tasked with filling the upcoming vacancy of Magistrate Judge Peggy A. Leen.  Steve Wynn's counsel therefore had direct access to Barbara Buckley at this time.

c.      On or about **October 19, 2018**, the Clark County Bar Association announced that, in connection with **Honorable George W. Foley's** retirement, the application deadline to fill his vacancy with the United States District Court, District of Nevada, was **November 30, 2018**.

d.      Youchah filed the WLV motion to dismiss the First Amended Complaint on **November 8, 2018** and the reply in support of the WLV motion to dismiss on **November 28, 2018**.  On **December 3, 2018,** the Nevada District Court appointed a merit selection panel regarding the vacancies of Magistrate George W. Foley (the Magistrate in the Nevada Matter) and Magistrate Carl Hoffman.  The Nevada District Court placed **Buckley** on this merit selection panel, and she was therefore a public official acting on behalf of the United States.

e.      The final reply brief regarding the Steve Wynn motion to dismiss, which was filed in connection with the WLV motion to dismiss, was filed on **December 26, 2018**.  A decision on the WLV motion to dismiss and Steve Wynn motion to dismiss was not rendered until approximately four (4) months later, on **April 18, 2019**.

f.      Meanwhile, on **February 4, 2019**, Youchah, as lead counsel for WLV, filed a motion to strike Plaintiff's first request for judicial notice.  On **February 19, 2019**, Youchah filed a reply brief regarding Limcaco's response to

---

[19] Peterson represented Steve Wynn in the Nevada Matter.

WLV's motion to strike.  On **March 12, 2019**, Youchah, filed a motion to strike Limcaco's second request for judicial notice.

g.      On **March 15, 2019**, the IEB, which assisted the MGC in (a) its investigation into the sexual misconduct allegations against Steve Wynn, and in (b) a determination regarding the suitability of various Wynn qualifiers per the Wynn Boston Casino, issued the Wynn MGC Report (a detailed 200-plus page report compiled after interviews with nearly 100 witnesses and addressing sexual misconduct allegations against Steve Wynn).  Limcaco requested the Wynn MGC Report from the MGC, as it was not otherwise publicly available at the time.  On **March 26, 2019**, the MGC issued a notice of hearing regarding a three-day public hearing in Massachusetts (regarding the suitability of various Wynn parties as a result of an investigation into the incidents surrounding the Limcaco Sexual Assault Report).  The hearing was set to take place from **April 2, 2019 through April 4, 2019** (the "MGC Public Hearing").

h.      On **April 2, 2019** (the same date that the MGC Public Hearing began), Christensen (Youchah's colleague at Jackson Lewis in Las Vegas), filed a notice of appearance as counsel for WLV.  Youchah was still listed as lead counsel for WLV at that time.  However, Christensen also filed a reply brief to Limcaco's response to WLV's motion to strike her second request for judicial notice on the same date (**noting that all prior filings in the Nevada Matter were filed by Youchah**[20]).

i.      On **April 8, 2019**, counsel for Wynn MA submitted a post-hearing brief to the MGC.  **This brief confirmed that Wynn Resorts would**

---

[20] It was later determined that the reason Ms. Christensen entered the Limcaco Nevada District Court Matter was because Youchah had (at that point) been selected to fill Magistrate Foley's vacancy and therefore, Youchah was now effectively a Judge in the same matter where she had been acting as lead counsel for WLV.

**actively report on litigation to the MGC**.  Although this brief explicitly provided that the company would notify the MGC within ten (10) days of a notice of any lawsuit against a qualifier for a gaming license related to the Wynn Boston Casino, Maddox, in particular, was actively sharing information with the MGC in an effort to maintain "transparency" and preserve the applicable gaming licenses in Massachusetts.  Everything was on the line during this crucial time.

        j.      The Nevada District Court filed an order granting the WLV motion to dismiss ten (10) days later on **April 18, 2019**.  The Nevada District Court denied Limcaco's requests for judicial notice and neglected to address the issue of leave to amend.  Twelve days later, on **April 30, 2019**, the MGC issued a decision and fined Wynn Resorts a record $35 million **but allowed the company to retain its license in Massachusetts**.  The MGC similarly fined Maddox $500,000 and installed Miller & Chevalier, a Washington D.C. firm specializing in government investigations into bribery, public corruption, violations of the FCPA and related matters to oversee Maddox and company, due to a threat of repeated misconduct.

        k.      On information and belief, Wynn Resorts reported the dismissal of the Nevada Matter[21] (which the company and various related parties attempted to influence through the selection of their own counsel to fill Magistrate Foley's vacancy, while a dispositive motion was pending before the Nevada District Court) to the MGC.  This report was made in connection with Wynn Resorts' (a) obligation to report on litigation to the MGC, and in support of the company's (b) ongoing efforts to salvage its license in connection with the Boston Wynn Casino.

        l.      Unbeknownst to Limcaco at the time, it was **publicly announced** that Youchah would fill Magistrate Foley's (**the Magistrate in the**

---

[21] Limcaco's case could have threatened the financial viability of Wynn Resorts, as a decision in Limcaco's favor would have further opened the floodgates in terms of litigation against the company and related parties.

**Nevada Matter**) vacancy in the Nevada District Court on **May 17, 2019** (the **public announcement** occurred about one month after the dismissal of Limcaco's case and merely weeks after the decision from the MGC on **April 30, 2019**). The Nevada District Court posted a similar announcement on **May 20, 2019**. On **May 28, 2019**, Youchah's representation of WLV ended.

          m.    Additional facts were uncovered in April, 2020.

          i.    The merit selection panel that was designated on **December 3, 2018** by the Nevada District Court, to fill the vacancy of Magistrate Foley included Buckley. This panel selected Youchah (WLV's lead counsel) to fill the vacancy of a judge in the Nevada Matter just prior to a decision dismissing the Nevada Matter. Buckley and her foundation (the LACSN) have close ties to both the Nevada District Court and Wynn Resorts/WLV. Buckley's salary is derived from her services on behalf of the LACSN.

          ii.    Sinatra, Wynn Resorts' former general counsel, who separated from the company on or around **August 3, 2018**, is on the LACSN's board of directors. Even though Sinatra "separated" from the company in **August 2018**, her separation agreement (filed with the SEC) established that she was contractually obligated to the company through **December 31, 2018** (which coincides with Buckley's appointment to the merit selection panel on **December 3, 2018**).

          iii.    Youchah's application to fill Magistrate Foley's vacancy was due no later than **November 30, 2018**. Buckley was placed on the merit selection panel that ultimately chose Youchah on **December 3, 2018**. Pursuant to the Judicial Conference of the United States (and in accordance with 28 U.S.C. § 631(b)(5)), the merit selection panel was required to provide the United States District Court, District of Nevada, with its nominee within **90 days of December 3, 2018 (here, March 3, 2019)**. Peterson (Steve Wynn's counsel in the Nevada Matter)

was placed on another merit selection panel with Buckley on **January 2, 2019** and had direct access to Buckley during the same period (the report from that merit selection panel would have been due by **April 2, 2019**, merely weeks before the Nevada Matter was dismissed on **April 18, 2019**).

     iv.  Wynn Resorts was in an ongoing conditional financial relationship with Buckley and the LACSN, when Buckley was appointed to the merit selection panel in **December, 2018**.

     v.  Pursuant to the MOU between Wynn Resorts/WLV and the LACSN (and signed by Sinatra and Buckley), **Wynn Resorts/WLV was set to pay the LACSN $100,000 in April 2019 (around the time Youchah was selected, Limcaco's case was dismissed, and the MGC issued an order allowing Wynn Resorts to keep its casino license in Massachusetts)**.  This payment was conditional and could be revoked in Wynn Resorts'/WLV's sole discretion.  **After Limcaco's case was dismissed, Wynn Resorts (which wholly owns WLV), then sponsored the LACSN's 19th annual awards on December 13, 2019**.  Sinatra was also part of a group (here, the group included David Belding and the Matthewson Charitable Lead Trust) that "donated" $250,000 to the LACSN, which was announced on **November 8, 2019**.  Wynn Resorts/WLV was then set to issue another conditional payment ("donation") to the LACSN in **April 2020**.  The "donations" from Wynn Resorts/WLV, which were paid to the LACSN in **April 2019 and April 2020**, where set forth in the MOU, which was entered into in 2017.  However, the MOU expressly provided that the "donations" were revocable in Wynn Resorts'/WLV's sole discretion.

     vi.  On information and belief, the RICO Defendants intended to use these payments to influence Buckley to elevate Youchah to the Nevada District Court, while Youchah's dispositive motion was pending and to improperly influence the Nevada Matter.  Indeed, Judge Du, even if unaware of the

RICO Defendants coordination, rendered a decision favorable to Youchah (who was then her new colleague and someone with presumably "greater credibility" due to her new position as a judge).  The RICO Defendants have an established pattern of engaging in this conduct for the purpose of obtaining and retaining casino licenses.

## V. CAUSES OF ACTIONS
### A. First Claim for Relief (Against All Defendants)
### (Violation of RICO, 18 U.S.C. § 1962(c))

85.    Plaintiff re-alleges and incorporates all of the allegations in paragraphs 1 through 84, above, as if fully set forth herein.

86.    For purposes of this First Claim for Relief, all RICO Defendants are persons under 18 U.S.C. § 1961(3), as defined in 18 U.S.C. § 1961(3).

87.    The RICO Defendants combined together as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce, to achieve common goals they could not achieve lawfully, and could not achieve without each other's collusion and cooperation.  This enterprise had a purpose, namely to improperly obtain casino licenses in Massachusetts and to then salvage the same licenses by any means necessary when the licenses were threatened by a MGC investigation centered around the Limcaco Sexual Assault Report.  As a result of the enterprise's purpose, the RICO Defendants initially withheld information from the MGC about Lightbody's involvement in the FBT/Wynn Resorts' land deal (along with their knowledge of Lightbody's criminal history) **to secure gaming licenses in Massachusetts**.  The RICO Defendants similarly withheld their knowledge of the Limcaco Sexual Assault Report from the MGC to achieve the enterprise's purpose of **obtaining the gaming licenses in Massachusetts**.

88.     When the Limcaco Sexual Assault Report became a central issue in the Okada Litigation via Elaine Wynn's Fifth Amended Complaint (filed in **2016**), the RICO Defendants continued to withhold their knowledge of various sexual assault allegations against Steve Wynn **to avoid disturbing the gaming licenses in Massachusetts**.  When the Limcaco Sexual Assault Report was publicly revealed via the WSJ Expose, the MGC launched an immediate and sweeping investigation and Limcaco filed suit, threatening the RICO Defendants' gaming licenses on their $2.6 billion casino project in Massachusetts.  The RICO Defendants then coordinated illicit payments to the LACSN (a) to elevate WLV's lead counsel (Youchah) to fill the vacancy of Magistrate Foley, (b) while WLV's dispositive motion (that Youchah filed) was pending.  The RICO Defendants failed to disclose that Sinatra was on LACSN's board of directors during this time and that Wynn Resorts was in an ongoing conditional financial relationship with the LACSN.  Youchah was then selected to fill the vacancy, Limcaco's case was dismissed without leave to amend and the MGC rendered a decision (fining Maddox and Wynn Resorts), **but allowing Wynn Resorts, Maddox and others to retain their casino licenses**.

89.     **The RICO Defendants intended to use Buckley's position as a public official to influence and dismiss the Nevada Matter, which directly coincided with their efforts to use the enterprise to retain the casino licenses on their $2.6 billion casino project in Massachusetts**.

90.     **Pattern of Racketeering Activity**: The RICO Defendants, each of whom are persons associated with or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The racketeering activity was made possible by RICO Defendants' regular and repeated use of the facilities and services

of the enterprise.  The RICO Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

91.   Predicate acts of racketeering are acts which are indictable under provisions of the U.S. Code enumerated 18 § U.S.C. 1961(1)(A) and (B), as more specifically alleged below.  The RICO Defendants, through the use of the enterprise, committed at least two predicate acts within the meaning of 18 U.S.C. § 1961(5), or at least aided and abetted such acts.  The predicate acts constitute a pattern, as the acts are sufficiently related to each other.  **Each predicate act was executed for the purpose of obtaining and/or retaining the Defendants' casino licenses**.

92.   Plaintiff specifically alleges that the RICO Defendants participated in the operation and management of the association-in-fact enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

93.   **Predicate Acts of Racketeering:**

a.   <u>Predicate Act One (Violations of the Massachusetts Gaming Act)</u>: Multiple felony violations of the Massachusetts Gaming Act, thus constituting "act[s] or threat[s] involving…gambling…chargeable under State law and punishable by imprisonment for more than one year" and thus "racketeering activity," by knowingly making false, misleading, and/or omissive statements in connection with the Wynn/FBT license application on multiple occasions **from January 2013 through September 2014**, and/or preparing or directing the preparation of false documents with the knowledge that they would be submitted to the MGC.  These false, misleading, and/or omissive statements:

i.   Concealed and/or misrepresented the then-current and/or previous ownership and/or financial interest of convicted criminals in the Everett Site.

ii.      Falsely represented that none of the proceeds from the Defendants' purchase of the Everett Site would be shared with convicted criminals.

iii.     Falsely represented that the "revised" deal with FBT was being adhered to by failing to disclose the secret side deal with Gattineri to give him extra compensation in return for his signature on one of the needed false certifications.

iv.      Concealed and or omitted information about the Limcaco Sexual Assault Report and Steve Wynn's related sexual predation both prior to the gaming licenses being awarded in **September 2014** and after the Limcaco Sexual Assault Report was revealed in the Okada Litigation in **2016**.  These acts are felony violations of the Massachusetts Gaming Act along with 18 U.S.C. §§ 1341, 1343 and 1952.

b. Predicate Act Two (Violation of the Travel Act, 18 U.S.C. § 1952): Multiple criminal violations of 18 U.S.C. § 1952 by travel by or on behalf of the Defendants in interstate commerce and/or use of the mails and other facilities in interstate commerce with the intent to promote, carry on, or facilitate the promotion or carrying on of unlawful activity, i.e. a business enterprise involving gambling while violating the provisions of the Massachusetts Gaming Act as described herein – by among other things, (1) traveling to Massachusetts to conspire with FBT regarding the preparation of false documents; (2) traveling to Massachusetts prior to being awarded gaming licenses in **September 2014** to give false testimony regarding Lightbody's involvement in the FBT/Wynn Resorts' land deal; (3) traveling to California to conspire with Gattineri; (4) traveling to Massachusetts prior to being awarded gaming licenses in **September 2014** to give false testimony and to conceal the Limcaco Sexual Assault Report; (5) traveling to Massachusetts to give false

testimony to the MGC in or around **April 2, 2019 through April 4, 2019** and withholding information regarding illicit payments from Wynn Resorts to Buckley's foundation, the LACSN (in connection with the elevation of Youchah and a decision on Nevada Matter), with such travel occurring **as early as November 2012 and as late as April 2019**.

      c. <u>Predicate Act Three (Honest Services Fraud, 18 U.S.C. § 1346)</u>: Additional violations of 18 U.S.C. §§ 1341, 1343 and 1346 by using the mail and/or wires in pursuit of schemes to fraudulently deprive the public of intangible rights to honest services by attempting to influence Buckley's position as a public official (through her appointment to a merit selection panel by the Nevada District Court on **December 3, 2018**) to elevate Youchah (WLV's lead counsel in the Nevada Matter) to fill the vacancy of Magistrate Foley (the Magistrate in the Nevada Matter).  This all occurred while Youchah's dispositive motion was pending and while Wynn Resorts was set to issue a conditional payment of $100,000 to Buckley's foundation (the LACSN) in **April 2019**.  The payments (and related illicit conduct) were issued to or on behalf of the LACSN in return for elevating Youchah and in exchange for influencing a decision on the Nevada Matter.  The ultimate purpose was to assist in salvaging the Massachusetts gaming licenses.  Indeed, these acts were part of many steps taken by the RICO Defendants in their effort to retains the gaming licenses in Massachusetts.  Buckley was placed on the panel on **December 3, 2018**; Youchah was selected (**in late March/early April 2019**); the LACSN received payment in or around **April 2019**; the Nevada Matter was dismissed (**on April 18, 2019**) and the MGC issued an order (**on April 30, 2019**) fining Wynn Resorts and Maddox, but allowing Wynn Resorts, Maddox and others to retain their gaming licenses in Massachusetts.  Wynn Resorts (through WLV) then sponsored the LACSN's 19th annual awards on **December 13, 2019**.  Sinatra was part of a group that also

contributed $250,000 to the LACSN.  An additional conditional payment of $100,000 was also issued to the LACSN in **April 2020**.

      d. <u>Predicate Act Four (Bribery, 18 U.S.C. § 201(b))</u>: Violations of 18 U.S.C. § 201(b)(1), beginning on or about **December 3, 2018**, in the United States District Court, District of Nevada, as the Defendants did directly and indirectly, corruptly give, offer and promise a thing of value, that is (1) a payment ("donation") of $100,000 in **April 2019**; (2) sponsorship of the LACSN's 19th annual awards on **December 13, 2019**; (3) a related "donation" involving Sinatra in the amount of $250,000, which was announced on **November 8, 2019**; and (4) a payment ("donation") of $100,000 in **April 2020** to Buckley (via her foundation, the LACSN), a public official (in connection with her appointment to the merit selection panel by the Nevada District Court on December 3, 2018), with the intent to influence official acts (that is, the elevation of Youchah (WLV's lead counsel in the Nevada Matter) to fill the vacancy of Magistrate Foley (while Youchah's dispositive motion was pending and with the intent to dismiss the Nevada Matter and to assist in salvaging the gaming licenses in Massachusetts)).

      e. <u>Predicate Act Five (Gratuity, 18 U.S.C. § 201(c))</u>: In violation of 18 U.S.C. § 201(c), beginning on or around **December 3, 2018**, and continuing thereafter through on or about **April 2020**, in the United States District Court, District of Nevada, the Defendants did directly and indirectly give, offer and promise a thing of value, that is (1) a payment ("donation") of $100,000 in **April 2019**; (2) sponsorship of the LACSN's 19th annual awards on **December 13, 2019**; (3) a related "donation" involving Sinatra in the amount of $250,00, which was announced on **November 8, 2019**; and (4) a payment ("donation") of $100,000 in **April 2020**, to Buckley (via her foundation, the LACSN), a public official (in connection with her appointment to the merit selection panel by the Nevada District Court on December 3, 2018), otherwise than as provided by law for the proper discharge of her duties.

These payments and related gifts were conditional "donations" and sponsorships that were issued by the Defendants because Buckley assisted in elevating Youchah to fill Magistrate Foley's vacancy (while her dispositive motion was pending) and these acts were done to influence and dismiss the Nevada Matter.  The Defendants ultimately intended to use these illicit efforts to assist in salvaging the gaming licenses in Massachusetts, as a favorable ruling in the Nevada Matter could have further opened the floodgates on litigation against the company and could have threatened the company's financial standing.

94.   **Continuity**

a.   <u>Closed-Ended Continuity</u>: There is sufficient closed-ended continuity because the Defendants' committed the predicate acts (as set forth above) **beginning in 2012 and these acts continued through at least April 2020 (covering a period of approximately eight years)**.

b.   <u>Open-Ended Continuity</u>: There is sufficient open-ended continuity because there is threat of repeated conduct.  Wynn Resorts continues to be one of the largest employers in Las Vegas, Nevada and is a repeated named defendant in matters pending in the Nevada District Court.  The LACSN has close ties to the Nevada District Court, as it is the primary recipient of pro bono cases referred from the same Court.  Indeed, Judge Du, who recently became the Chief Judge of the Nevada District Court in **2019**, signed an Amended Order on **October 25, 2019**, where the Nevada District Court refers the majority of its pro bono cases in Las Vegas to the LACSN.  Buckley also continues to maintain a deep relationship with Wynn Resorts.  Sinatra remains on the LACSN's board of directors.  Maddox and Wynn Resorts continue to be monitored by Miller & Chevalier due to the threat of repeated misconduct.  Steve Wynn remains under investigation for his ties to public corruption.

c.      Indeed, Steve Wynn has been investigated recently for his ties to Broidy.  Both Steve Wynn and Broidy were top Republican National Conventional fundraisers.  On **October 20, 2020**, Broidy plead guilty to one count of conspiracy to violate the Foreign Agents Registration Act, for accepting up to $9 million for agreeing to lobby President Donald Trump, the Attorney General and other high-level officials in the Administration and the DOJ to drop civil forfeiture proceedings and related matters concerning embezzlement of billions of dollars from 1MDB.  Broidy also agreed to lobby the administration and the DOJ on behalf of the People's Republic of China, to arrange for the removal and return of Guo Wengui, a Chinese dissident.  Steve Wynn resigned as the Chairman of the Republican Finance Committee in January 2018 in connection with the WSJ Expose that uncovered the Limcaco Sexual Assault Report.  Broidy called President Trump from Steve Wynn's yacht in August 2017 to check on the status of the potential removal of Guo Wengui and Steve Wynn has recently been under investigation for his ties to these criminal acts.

d.      The Defendants continue to be investigated by various government agencies and remain under scrutiny due to the threat of repeated misconduct.

95.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Limcaco has been injured in her business and property. Specifically:

a.   Limcaco has been deprived of the recovery of her actual damages outlined in the Nevada Matter.  Limcaco served her initial disclosures on the defendants (in the Nevada Matter) on **November 21, 2018**, evidencing $807,083.22 in actual damages (based on her salary only), and addressed future damages, punitive and exemplary damages, and attorney's fees and costs.  As Limcaco earned a salary of $65,000 per year when she was hired by WLV in 2005,

these actual damages (based on her salary only) equal no less than $931,666.67 to date.  Limcaco was similarly deprived of recovering future, punitive and exemplary damages tied to medical treatment related to her claims for intentional infliction of emotional distress and otherwise.

        b.  Limcaco and her counsel incurred substantial expenses in connection with the Nevada Matter and related litigation (along with attorney's fees that are subject to proof at trial), which were lost as a direct result of the Defendants' unlawful misconduct.

96.     As a result, Limcaco has suffered actual damages believed to be no less than $931,666.67, but subject to proof at trial.  Moreover, Limcaco is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorney's fees, in accordance with 18 U.S.C. § 1964(c).

### B.  Second Claim for Relief (Against Wynn, Maddox and Sinatra) (Violation of RICO, 18 U.S.C. § 1962(c))

97.     Plaintiff re-alleges and incorporates all of the allegations of paragraphs 1 through 96, above, as if set forth more fully herein.

98.     Defendants Steve Wynn, Maddox and Sinatra (the "Wynn Control Defendants," who are all of the RICO Defendants other than Wynn Resorts) all constitute persons within the meaning of 18 U.S.C. § 1961(3).

99.     In addition to the association-in-fact enterprise set forth herein, Wynn Resorts (not sued as a defendant for this claim for relief) was at all relevant times an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and affecting interstate commerce.

100.    The Wynn Control Defendants conducted and participated in the conduct of Wynn Resort's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) over an extended period of time, including:

a. Committing or causing to be committed the predicate acts referenced above.

b. The details of these predicate acts and the roles of the individual Wynn Control Defendants in committing these predicate acts and/or causing them to be committed are set forth above.

101.   As a direct and proximate result of the Wynn Control Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Limcaco has been injured in her business or property. Specifically:

a. Limcaco has been deprived of the recovery of her actual damages outlined in the Nevada Matter.  Limcaco served her initial disclosures on the defendants (in the Nevada Matter) on **November 21, 2018**, evidencing $807,083.22 in actual damages (based on her salary only), and addressed future damages, punitive and exemplary damages, and attorney's fees and costs.  As Limcaco earned a salary of $65,000 per year when she was hired by WLV in 2005, these actual damages (based on her salary only) equal no less than $931,666.67 to date.  Limcaco was similarly deprived of recovering future, punitive and exemplary damages tied to medical treatment related to her claims for intentional infliction of emotional distress and otherwise.

b. Limcaco and her counsel incurred substantial expenses in connection with the Nevada Matter and related litigation (along with attorney's fees that are subject to proof at trial), which were lost as a direct result of the Defendants' unlawful misconduct.

102.   As a result, Limcaco has suffered actual damages believed to be no less than $931,666.67, but subject to proof at trial.  Moreover, Limcaco is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorney's fees, in accordance with 18 U.S.C. § 1964(c).

### C. Third Claim for Relief (Against All Defendants)
### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))

103.   Plaintiff re-alleges and incorporates all of the allegations of paragraphs 1 through 102, above, as if more fully set forth herein.  As set forth above, all of the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), by forming the illegal association-in-fact enterprise set forth above and conducting and participating in the conduct of its affairs through a pattern of racketeering activity.

104.   Each RICO Defendant necessarily recognized, given the objective of the conspiracy, and agreed that the conspiracy would commit at least two predicate acts.

105.   In addition to this conspiracy, all of the Wynn Control Defendants agreed and conspired to violate 18 U.S.C. § 1962(c), by conducting and participating in the conduct of Wynn Resorts' affairs through a pattern of racketeering activity, and each Wynn Control Defendant, as set forth above, committed one or more overt acts in furtherance of the conspiracy and necessarily recognized, given the objective of the conspiracy, and agreed that the conspiracy would commit at least two predicate acts.

106.   As a direct and proximate result of RICO Defendants' conspiracy, their overt acts taken in furtherance thereof, and their violations of 18 U.S.C. § 1963(d), Limcaco has been injured in her business and property. Specifically:

a.   Limcaco has been deprived of the recovery of her actual damages outlined in the Nevada Matter.  Limcaco served her initial disclosures on the defendants (in the Nevada Matter) on **November 21, 2018**, evidencing $807,083.22 in actual damages (based on her salary only), and addressed future damages, punitive and exemplary damages, and attorney's fees and costs.  As Limcaco earned a salary of $65,000 per year when she was hired by WLV in 2005, these actual damages (based on her salary only) equal no less than $931,666.67 to

date.  Limcaco was similarly deprived of recovering future, punitive and exemplary damages tied to medical treatment related to her claims for intentional infliction of emotional distress and otherwise.

         b.   Limcaco and her counsel incurred substantial expenses in connection with the Nevada Matter and related litigation (along with attorney's fees that are subject to proof at trial), which were lost as a direct result of the Defendants' unlawful misconduct.

107.   As a result, Limcaco has suffered actual damages believed to be no less than $931,666.67, but subject to proof at trial.  Moreover, Limcaco is entitled to recover treble the actual damages sustained, plus costs of suit, including reasonable attorney's fees, in accordance with 18 U.S.C. § 1964(c).

WHEREFORE, Limcaco seeks judgment against Defendants as follows:

         a.   Compensatory damages in an amount to be determined at trial, but believed to be no less than $931,666.67;

         b.   Treble damages as provided for under both federal and state law;

         c.   Costs of suit, including reasonable attorney's fees, as provided for under both federal and state law.

         d.   Such other relief as may be just.

December 16, 2020                    Respectfully submitted,


By:  __/s/ Jordan Matthews_____
      JORDAN MATTHEWS (SBN 316301)
      WEINBERG GONSER LLP
      10866 Wilshire Blvd., Suite 1650
      Telephone:     (424) 239-2867
      Facsimile:     (424) 238-3060

Email:           jordan@weinberg-gonser.com


MICHAEL D. HOLTZ (SBN 149616)
THE HOLTZ FIRM
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:      (310) 464-1088
Facsimile:      (323) 206-5535
Email:          mholtz@theholtzfirm.com

*Attorneys for Plaintiff Angelica Limcaco*

## **DEMAND FOR JURY TRIAL**

Pursuant to the Seventh Amendment to the U.S. Constitution, Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff ANGELICA LIMCACO hereby demands a trial by jury of this action.


December 16, 2020                Respectfully submitted,


By:  /s/ Jordan Matthews
      JORDAN MATTHEWS (SBN 316301)
      WEINBERG GONSER LLP
      10866 Wilshire Blvd., Suite 1650
      Telephone:      (424) 239-2867
      Facsimile:       (424) 238-3060
      Email:            jordan@weinberg-gonser.com

      MICHAEL D. HOLTZ (SBN 149616)
      THE HOLTZ FIRM
      21650 Oxnard Street, Suite 500
      Woodland Hills, CA 91367
      Telephone:      (310) 464-1088
      Facsimile:       (323) 206-5535
      Email:            mholtz@theholtzfirm.com

      *Attorneys for Plaintiff Angelica Limcaco*